```
USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 9/27/18
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CHRISTOPHER A. SOUTH,

                Plaintiff,

      v.

CONTINENTAL CASUALTY COMPANY,

                Defendant.

---

No. 17-CV-5741

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

Plaintiff Christopher South brings this action alleging age discrimination and hostile work environment in violation of the New York City Human Rights Law. Defendant Continental Casualty Company now moves for summary judgment. For the reasons set forth below, Continental's motion is granted.

## FACTUAL BACKGROUND[1]

The following facts, construed in the light most favorable to South, are undisputed unless otherwise noted. *See, e.g., Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011).[2]

### A.    The Parties

Plaintiff Christopher A. South is an attorney and former employee of Continental who was fired at the age of 60. Def. 56.1 ¶¶ 1–2. Continental provides insurance protection to businesses and professionals. Def. 56.1 ¶ 3. South was an at-will employee. Def. 56.1 ¶ 5.

---

[1] These facts are drawn from the parties' submissions in connection with the instant motion, including the Rule 56.1 Statement submitted by Continental ("Def. 56.1") and South's Counterstatement. Where facts in a party's statement are supported by testimonial or documentary evidence, and denied only by way of conclusory statement without citation to conflicting testimonial or documentary evidence, the Court finds such facts to be true. *See* S.D.N.Y. Local Rule 56.1(c)–(d). The Court notes that South did not, pursuant to Local Rule 56.1(b), submit any additional paragraphs of material facts with respect to which he contends there is a dispute necessitating a trial.

[2] In ruling on the instant motion, the Court will consider materials attached to a supplemental declaration provided by South, which contains deposition excerpts that are cited in his Rule 56.1 Counterstatement.

Charles Siegel was the Managing Trial Attorney of the NYC staff counsel office and South's supervisor. Def. 56.1 ¶ 6. Siegel was 62 years old on the date of South's termination. Def. 56.1 ¶ 6. Brian Granstrand, the Vice President of Staff Counsel, was Siegel's manager and was 59 at the time. Def. 56.1 ¶ 7. Mark Stephens, the Senior Vice President of Claims, who was 57, was Granstrand's supervisor. Def. 56.1 ¶ 8. Stephen Perry, the Director, Eastern Region, of the Major Case Unit, was 66 years old when South was fired. Def. 56.1 ¶ 9.

### B.    South's Employment

Continental hired South in 1996 as an attorney at its NYC staff counsel office. Def. 56.1 ¶ 10. Continental's staff counsel offices serve the company's insureds, with all of the attorneys employed by Continental. Def. 56.1 ¶ 11.

Siegel became South's direct supervisor in 2001. Def. 56.1 ¶ 12. As a senior litigation attorney, South was responsible for handling insurance defense or coverage litigation for insureds, which included developing strategy, handling discovery, drafting pleadings and motions, and trying all aspects of a case. Def. 56.1 ¶ 13. South was also responsible for communicating with the insureds, his supervisor, and Continental claims professionals. Def. 56.1 ¶ 13. South was assigned to work on smaller exposure matters, known as "Service Center" cases. Def. 56.1 ¶ 13.

### C.    The MCU

In approximately 2005, Continental established the Major Claims Unit ("MCU"), comprised of claims adjusters responsible for handling cases with a higher level of exposure or greater complexity. Def. 56.1 ¶ 69. Former employee Michael Anway, then Vice President of Claims, helped establish the MCU. Def. 56.1 ¶ 70. Continental hired Perry shortly after creating the MCU, and he was also among those who implemented it. Def. 56.1 ¶ 70. Anway was 58 years old at the time the MCU was formed. Def. 56.1 ¶ 70. He retired, effective July 31, 2015, at the

age of 68, but he was not in the MCU at the time of South's termination. Def. 56.1 ¶ 70. Siegel, Stephens, and Granstrand played no role in the formation of the MCU. Def. 56.1 ¶ 71.

The MCU generally handled matters in three scenarios: (1) there was at least $150,000 reserve value for Continental's insured; (2) the total estimated value of the case exceeded $500,000; or (3) the matter involved complex litigation issues. Def. 56.1 ¶ 72. After inception, the MCU, which consisted of management-level employees and line adjusters, decided which attorneys would be approved to handle these cases. Def. 56.1 ¶ 73.[3] The director-level employees within MCU and Anway discussed with Stephens that they wanted attorneys who had exhibited an ability to handle complex matters. Def. 56.1 ¶ 73.[4] The MCU Claim Department typically identified attorneys to be approved. Def. 56.1 ¶ 74. If a managing trial attorney, such as Siegel, wished to have an attorney cleared to handle MCU cases, the unit's approval was necessary. Def. 56.1 ¶ 75. Siegel and Granstrand never belonged to the MCU, nor did they ever have the authority to approve attorneys to handle its matters. Def. 56.1 ¶ 76.

When the MCU was first established, Service Center attorneys such as South continued to handle MCU cases that existed prior to its creation. Def. 56.1 ¶ 87. Newly filed MCU cases, however, were always assigned to MCU staff. Def. 56.1 ¶ 87. In the case intake process, Claim Department employees would determine whether it qualified as an MCU matter. Def. 56.1 ¶ 77. They would then send the case to MCU, which was required to accept it or explain why it did not comport with MCU guidelines. Def. 56.1 ¶ 77. Matters would occasionally be reclassified as an MCU case if facts arose that warranted a change, at which point it would be reassigned to an MCU

---

[3] South disputes this statement. The evidence to which he cites, however, does not contradict it. *See* Perry Tr. 54:22–55:11; Stephens Tr. 48:6–14, 58:9. The Court has observed that this is a common flaw in South's 56.1 Counterstatement. For the sake of efficiency, the Court will refer back to this note for the remaining disputes in which South relies on parts of the record that do not contradict the statement set forth by Continental in its Rule 56.1 Statement.

[4] South disputes this statement, relying on the deposition testimony of Perry and Stephens. Perry Tr. 54:22–55:11; Stephens Tr. 48:6–14, 58:9. See note 3.

attorney. Def. 56.1 ¶ 78. Although South was never approved to handle MCU matters, the unit thus had exposure to his performance. Def. 56.1 ¶ 78.

The relatively large number of MCU matters were handled by a limited number of attorneys. Def. 56.1 ¶ 82. The MCU received more requests from Siegel than from any other manager to have MCU cases remain with Service Center attorneys. Def. 56.1 ¶ 94. Siegel sought the MCU's approval to have several attorneys in the NYC office, including South, approved to handle its matters. Def. 56.1 ¶ 81. The MCU, however, was not pleased with South's work. Def. 56.1 ¶ 83.[5] Perry also did not want South handling MCU cases. Def. 56.1 ¶ 84. Siegel was thus forced to transfer re-classified cases that South had been handling. Def. 56.1 ¶ 85.

### D.   South Receives Average Performance Reviews

South received a "Meets Expectation" rating regarding his job performance for the years 2009, 2011, and 2012, "Exceeds Expectations" in 2010, and "Partially Meets Expectations" for 2013, all of which were prepared by Siegel. Def. 56.1 ¶¶ 23, 27.

In his 2009 year-end appraisal, South received a "Meets Expectation" in every category. Def. 56.1 ¶ 24. Siegel advised, however, that South should "be more proactive in his reporting in order to be more customer focused and to have a solid relationship with all of his claim clients." Def. 56.1 ¶ 25. Siegel also noted the need to "develop his skills with the technology provided in order to meet his claims customers reporting needs." Def. 56.1 ¶ 26.

In 2010, South received an "Exceeds Expectations," with "Meets Expectations" in the Performance Goals and Relationships Fostered sections. Def. 56.1 ¶ 27. South's rating returned to "Meets Expectations" for 2011. Def. 56.1 ¶ 28. In his self-assessment, South provided himself

---

[5] South disputes this statement. His opposition is predicated, however, on his own conclusory opinions regarding things about which he has no personal knowledge and which therefore are insufficient to create a genuine dispute of material fact. *See Colon v. Trump Int'l Hotel & Tower*, No. 10-CV-4794 (JGK), 2011 WL 6092299, at *8 (S.D.N.Y. Dec. 7, 2011).

with a rating of "Far Exceeds Expectations." Def. 56.1 ¶ 28. For 2012, Siegel and South each gave the same ratings as the previous year. Def. 56.1 ¶ 29. Siegel again noted that South needed to be more proactive. Def. 56.1 ¶ 30. South, by contrast, complimented himself on the number of files he had closed, to which Siegel responded: "[South] had a decent year in closing files. However, he had some problems with some of his files that were taken over by MCU. That in return required these files to be transferred internally as well as one to a panel form. I expect to see improvement in this area." Def. 56.1 ¶ 31.

In August of 2013, South received a mid-year review, in which Siegel noted:

> I am concerned about the total analysis of your files via your reporting. You need to expand your analysis to address all aspects and issues of the case and be proactive in obtaining the information and evidence needed to defend the case. In that regard, you need to reach out to all witnesses and find out what they know. Obtain any and all documents, videos and items that have relevance to our defense. You can't wait for the information to come to you.

Def. 56.1 ¶ 32. Siegel further commented that:

> [South] needs to continue to stay on focus. He has gotten high praise from some of our [Continental] insureds but also concerns from some others. [South] needs to work on better communications with some of his clients and claims. He needs to be more proactive so he provides good customer service to his [Continental] adjusters and insureds.

Def. 56.1 ¶ 33. Summing up his review, Siegel concluded: "[South], as noted above, needs to refocus his energies and work on developing better relationships with certain clients and claim adjusters. He needs to keep an open mind and develop strategies to defend and close his files quickly and efficiently." Def. 56.1 ¶ 34. In response, South asserted that he was the "[b]est trial attorney" in the NYC office. Def. 56.1 ¶ 35.

In addition to providing feedback via formal evaluations, Siegel met with South informally. Def. 56.1 ¶ 37. For instance, they met in 2012 to address an occasion on which South had not asked a plaintiff during his deposition whether he had ever been convicted of a crime, with an

5

investigation later revealing a homicide conviction. Def. 56.1 ¶ 38. In another matter, South did not file a responsive motion because the due date was listed as Saturday and judgment was thus entered against Continental's insured. Def. 56.1 ¶ 39. Siegel did not learn of this until the plaintiff's counsel contacted him. Def. 56.1 ¶ 39.

There were also complaints from other Continental employees and its insureds. Def. 56.1 ¶ 40.[6] For example, on February 13, 2013, Eric Thompson, the Northeast Region Claims Manager of the MCU, complained that South "[d]oes not report timely, nor respond to request for updates." Def. 56.1 ¶ 41. Granstrand relayed the information to Siegel. Def. 56.1 ¶ 41. On June 6, 2014, the HealthPro department told Granstand that South was an "okay attorney," but they had to "stay on top of [him] to report back." Def. 56.1 ¶ 42. Granstrand informed Siegel of this feedback, who in turn forwarded it to South. Def. 56.1 ¶ 42. Siegel also received complaints directly from Continental insureds. Def. 56.1 ¶ 44.[7] In August 2013, for example, he scheduled a meeting with employees of Ralph Lauren after they too complained about South's work product. Def. 56.1 ¶ 44.[8]

On December 6, 2013, Siegel issued South a letter outlining the deficiencies in his performance. Def. 56.1 ¶ 45.[9] Siegel hand-delivered the letter to South in a meeting that was also attended by Elizabeth Mansfield, the Human Resources Director, and Granstrand. Def. 56.1 ¶ 45. In his letter, Siegel summarized South's failure to draft initial reports and status updates, as well as to investigate cases with sufficient thoroughness. Def. 56.1 ¶ 49.[10] Siegel noted, for example,

---

[6] South disputes this statement, relying on his own deposition testimony. Pl. Tr. 217:10–25. See note 3.
[7] South disputes this statement, relying on his own deposition testimony. Pl. Tr. 99:20–100:12, 215:2–216:13. See note 3.
[8] South disputes this statement, relying on his own deposition testimony. Pl. Tr. 99:20–100:12, 215:2–216:13. See note 3.
[9] South disputes this statement, relying on his own deposition testimony. Pl. Tr. 134:11. See note 3.
[10] South disputes this statement, relying on the December 6, 2013 letter. Savage Decl., Ex. N, ECF No. 23-14. See note 3.

one matter in which South did not prepare an initial report until after March 25, 2011, even though the case was assigned to him in November 2010. Def. 56.1 ¶ 50. Siegel further noted that it took South nearly three years to implead a third party in another case, even though the file contained facts that should have placed South on notice. Def. 56.1 ¶ 52.[11] In a different matter, South had authored very few substantive reports for the Claims Department, aside from an initial assessment in November 2010 and a deposition summary in April 2013. Def. 56.1 ¶ 53.[12] Siegel further complained of yet another instance in which Siegel wrote only two substantive reports. Def. 56.1 ¶ 55. Continental advised South to improve his performance within thirty days. Def. 56.1 ¶ 56. At South's request, the period was extended to forty-five days. Def. 56.1 ¶ 56.

Around this time, Siegel also issued performance deficiency letters to Stuart Apploff and Richard O'Connell. Def. 56.1 ¶ 48. He further issued a partially meets expectations rating to Robert Cypher in his 2012 year end performance review. Def. 56.1 ¶ 48. Cypher's performance improved temporarily before returning to previous levels. Def. 56.1 ¶ 48.

After receiving Siegel's December 6, 2013 letter, South wrote a series of near-weekly emails to Siegel, Granstrand, and Mansfield, summarizing the work he had performed and explaining why South believed he should not have received the letter. Def. 56.1 ¶ 57. South did not reference age discrimination in any of this correspondence. Def. 56.1 ¶ 58.

In early 2014, South received his evaluation for 2013, in which Siegel rated him as "Partially Meets Expectations." Def. 56.1 ¶ 59. Under "Performance Goals," Siegel noted:

> Over the past year, some of your claims partners (MCU) have requested that your handling of a particular file be evaluated by the MTA for the purposes of an internal transfer. Some of the files that you worked on were in the Service Center and moved to MCU were not worked up the way you have done so in the past. Your

---

[11] South even testified at his deposition that it was "obvious" that the third party would be required to satisfy indemnity, but admitted that he did not implead the party for nearly three years. Pl. CS 56.1 ¶ 52.

[12] South acknowledged not having submitted any additional reports in that matter. Pl CS. 56.1 ¶ 54.

reporting during the year has been sporadic at time[s].   This isn't meeting expectations.

Def. 56.1 ¶ 60.  In the "Total Claim Outcome" category, Siegel explained:

> Your reporting has been untimely and non existent [*sic*] at times.  Some reports lack issue recognition based on the claims alleged and others document your failures to aggressively defend the [Continental] insured by developing the evidence and experts needed to defend the case.  As noted in the written warning letter given to you last December, this is not meeting expectations for an attorney in your position.

Def. 56.1 ¶ 61.  In the "Overall Comments" section, Siegel advised South that he needed to "improve in the area of prompt reporting, issue recognition in the files, utilizing FAST TRACK more and developing in a prompt manner the evidence and experts needed to properly defend the [Continental] insureds."  Def. 56.1 ¶ 63.  South did not ask Siegel about any of these comments. Def. 56.1 ¶ 64.

In mid-2014, South received his mid-year review, in which Siegel instructed him to "work on issue recognition and developing the evidence faster" in order to allow for proper evaluations of claims.  Def. 56.1 ¶ 68.  Siegel again noted the need to be more "proactive."  Def. 56.1 ¶ 68.

**E.     The MCU Becomes Overwhelmed**

Beginning in 2011 or 2012, the MCU emphasized the need to have only its attorneys handle MCU matters, and therefore asked Siegel to re-assign the MCU cases that were being handled by Service Center attorneys.  Def. 56.1 ¶ 88.  On January 3, 2012, Raymond Searles, the MCU Claims Manager, emailed Perry updating him on a conversation he had with Granstrand, in which they discussed the importance of assigning MCU cases to attorneys approved to work on such matters. Def. 56.1 ¶ 89.  In the email, Searles mentioned that since MCU cases would only be handled by attorneys in that unit, there might be a need for additional MCU attorneys.  Def. 56.1 ¶ 89.  On January 15, 2013, Searles emailed Siegel to remind him that any case re-designated from the Service Center had to be given to an MCU attorney.  Def. 56.1 ¶ 90.

8

On January 24, 2013, Roy Orr, the Vice President of Claims, who was 63 at the time of South's termination, Granstrand, Stephens, and Perry met to discuss the reassignment of MCU cases. Def. 56.1 ¶ 91. Prior to that meeting, Perry drafted an email noting that issues had often arisen in the NYC office because Siegel routinely asked to keep MCU cases with Service Center attorneys. Def. 56.1 ¶ 92. Perry noted that he could not "think of any of the other current members of the firm that [he] would recommend be added to the [MCU-approved] list." Def. 56.1 ¶ 92.

In January 2014, Granstrand reviewed the monthly case summaries, noticing that the MCU caseload in NYC had increased substantially while Service Center cases had decreased. Def. 56.1 ¶ 96. On March 12, Granstrand emailed Siegel to ask why, to which Siegel responded:

> The MCU attys have more because there is less of them, and the MCU is constantly taking service center files from the service center and moving them to MCU attorneys. We seem to move service center files faster than MCU files. Also, I have had some of these lower exposure MCU files worked on by service center attorneys with a MCU [approved attorney] overseeing all aspects of the work and reports.

Def. 56.1 ¶ 97. Indeed, by 2014, the NYC office was "drowning with MCU work" and had more "MCU cases than . . . lawyers designated to handle MCU." Def. 56.1 ¶ 99.

Because MCU designated cases in the NYC office had increased, Granstrand discussed with Perry and Stephens the need to add more MCU attorneys. Def. 56.1 ¶ 100.[13] Granstrand and Siegel also discussed hiring three additional MCU attorneys in the NYC office. Def. 56.1 ¶ 101. Granstrand explained to Siegel that if the NYC office hired three new MCU attorneys, the office would first have to discharge three Service Center attorneys. Def. 56.1 ¶ 101.

---

[13] South disputes this statement, relying on the deposition testimony of Siegel and Perry. Siegel Tr. 21:20–22:7, 27:22–28:25, 71:20–72:7; Perry Tr. 38:19–21. See note 3.

**F.      The Reduction in Force**

In February 2014, Mansfield provided Siegel with a spreadsheet to use in evaluating Service Center attorneys in a variety of categories, including technical knowledge and skills, customer focus, professional integrity, problem solving skills, and collaboration. Def. 56.1 ¶ 102. South received an overall rating of 2, the lowest score. Def. 56.1 ¶ 103. Siegel gave South a rating of "2" in the following areas: (1) technical skills due to South's difficulty with software; (2) customer service because he had problems "from time to time with his tone when dealing with people, became agitated, and appeared to talk down to people"; (3) professional integrity because South would occasionally lose his composure; (4) "focus on results," as he did not always hone in on the critical aspects of his cases; (5) "analyzes and solves problems" as a result of his occasional struggle to apply facts to the law; and (6) "teamwork and collaboration" because South failed to do what was asked of him and did not adjust his behavior despite warnings. Def. 56.1 ¶¶ 105–07, 110–12.[14]

Siegel returned the spreadsheets to Granstrand and Mansfield.   Def. 56.1 ¶ 113. Continental wanted to implement the reduction in force in June 2014. Def. 56.1 ¶ 114.  Siegel, however, pushed back because he had not integrated the new MCU attorneys and was concerned that he would be short-staffed. Def. 56.1 ¶ 114. As a result, Continental agreed to a postponement. Def. 56.1 ¶ 114.  In August of 2014, Mansfield asked Siegel to update the spreadsheets. Def. 56.1 ¶ 115.  Siegel again ranked the attorneys using the same criteria. Def. 56.1 ¶ 116.

This time, South received an overall rating of 2.2. Def. 56.1 ¶ 118. Stuart Apploff, age 62, and Robert Cypher, age 60, received scores of 2.2 and 2.1, respectively. Def. 56.1 ¶ 118. As the three lowest ranked attorneys, they were selected for termination. Def. 56.1 ¶ 118. The highest

---

[14] South disputes parts of these statements, relying on his own deposition testimony.  Pl. Tr. 110:15–111:4, 215:2–216:3.  See note 3.

ranked attorney was Cohen, who received a score of 4.8.  Def. 56.1 ¶ 119.  At no point did

Granstrand discuss with anyone the ages of the attorneys selected for the reduction in force.  Def.

56.1 ¶ 120.[15]  Perry and Stephens played no role in the section of attorneys for the reduction in

force.  Def. 56.1 ¶ 121.[16]

Continental utilized Siegel's spreadsheets to select the attorneys to be terminated, but

Siegel did not make the final decisions.  Def. 56.1 ¶ 117.  The reduction in force affected only the

NYC office.  Def. 56.1 ¶ 122.[17]  It was the only of Continental's offices to experience a reduction

in force due to the increasing volume of MCU cases.  Def. 56.1 ¶ 122.[18]  Because the reduction in

force was limited to the NYC office, Continental did not consider or review the performance or

workload of attorneys in any other office.  Def. 56.1 ¶ 122.[19]

South was terminated on September 15, 2014.  Def. 56.1 ¶ 123.  Siegel, Granstrand, and

Mansfield were present at the termination meeting.  Def. 56.1 ¶ 123.  South's last day was October

15, 2014, to afford him an opportunity to look for a new job.  Def. 56.1 ¶ 123.  At the meeting,

South told Granstrand and Mansfield that Siegel was a "coward and a cheat."  Def. 56.1 ¶ 124.  At

no time did South reference discrimination.  Def. 56.1 ¶ 124.

---

[15] South disputes this statement, relying on his own affidavit.  Pl. Decl. ¶ 13, ECF No. 32.  See note 3.
[16] South disputes this statement but provides no evidence.  *See* Pl. Tr. 123:12–137:10.  His position appears to be twofold: (1) Stephens was often involved in evaluations of attorneys and (2) Betsy Mansfield, who worked under Stephens, assisted in South's firing.  But neither of these facts, if true, establish that Stephens made the decision to terminate South in September 2014.  Indeed, South even concedes that he did not correspond with Stephens during the relevant period.  *See* Pl. Tr. 125:17–21.  Nor does speculation from South that Stephens allegedly played a role in hiring the MCU attorneys establish that Stephens made the decision to fire South.  South seems to repeatedly conflate the roles of the managers responsible for the MCU and those who terminated his employment.  South further concedes that Stephens told people that he was terminated because he didn't perform MCU work.  *See* Pl. Tr. 129:14–23.
[17] South disputes this statement, relying on his own deposition testimony.  Pl. Tr. 278:20–279:9, 131:19–132:24.  See note 3.
[18] South disputes this statement, relying on his own deposition testimony.  Pl. Tr. 278:20–279:9, 131:19–132:24.  See note 3.
[19] South disputes this statement, relying on his own deposition testimony.  Pl. Tr. 278:20–279:9, 131:19–132:24.  See note 3.

After the reduction in force, the following MCU-approved attorneys remained in the NYC office: (1) Jack Cohen, age 58; (2) Nikolaos Diamantis, age 38; (3) Loretta Hottinger, age 63; (4) Stephanie Johnson, age 47; (5) Philip Menna, age 49; (6) Reed Podell, age 48; (7) Thomas Ryan, age 47; and (8) Charles Siegel, age 63. Def. 56.1 ¶ 127. The following attorneys were not approved to work on MCU cases: (1) Richard Dell, age 65; (2) Cathy Gallagher, age 56; (3) Julie Kegan, age 42; (4) Alfred Lewyn, age 58; (5) Selma Moy, age 47; (6) Richard O'Connell, age 56; and (7) Irosha Ratnasekera, age 41. Def. 56.1 ¶ 127. In June 2015, Continental promoted Jack Cohen, then 59 and who remained MCU-approved, to Assistant Managing Trial Attorney. Def. 56.1 ¶ 129. Philip Menna, Reed Podell, and Thomas Ryan were the three MCU-approved attorneys hired in conjunction with the reduction in force. Def. 56.1 ¶ 125.

## PROCEDURAL HISTORY

This is the second time South has brought suit alleging discrimination by Continental based on these events. On March 15, 2015, he commenced an action pursuant to the ADEA, NYSHRL, and NYCHRL. Dkt. 15-CV-1627, ECF No. 1. The Honorable William H. Pauley granted Continental summary judgment with respect to South's federal and state law claims, while declining to exercise supplemental jurisdiction over the city claims. *South v. Con'l Cas. Co.*, No. 15-CV-1627 (WHP), 2017 WL 782909, at *9 (S.D.N.Y. Feb. 28, 2017). South then re-filed his NYCHRL claims in state court, with Continental removing the action on July 28, 2017. ECF No. 1. Because the two cases are predicated on the same events, the parties did not engage in discovery before this Court. After they failed to reach a settlement in mediation, Continental filed the instant motion for summary judgment.

**STANDARD OF REVIEW**

Federal Rule of Civil Procedure 56 authorizes a court to grant summary judgment if the movant establishes that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008). A fact is "material" if it "might affect the outcome of the suit under the governing law," and it is "genuinely in dispute" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (citations omitted). In deciding such a motion, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod*, 653 F.3d at 164 (citation omitted).

The moving party has the initial burden of demonstrating that no genuine issue of material fact exists. *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). If it satisfies this burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* "However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the non[-]movant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial." *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (citation and alteration omitted).

**DISCUSSION**

**I.    Discrimination**

At the summary judgment stage, claims under the NYCHRL must be assessed pursuant to the burden-shifting framework of *McDonnell-Douglas*, as well as a mixed motives analysis. *See Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 n.8 (2d Cir. 2013). Under

*McDonnell-Douglas*, to survive a motion for summary judgment, "a plaintiff must first establish a *prima facie* case of discrimination by showing that: (1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 82-83 (2d Cir. 2015) (citation omitted).

If a plaintiff establishes a *prima facie* case, "a presumption arises that more likely than not the adverse conduct was based on the consideration of impermissible factors" and the "burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the disparate treatment." *Id.* at 83. If the employer proffers a legitimate reason, "the burden shifts back to the plaintiff to prove that the employer's reason was in fact pretext for discrimination." *Id.* (citation omitted). "[T]he plaintiff must [then] put forth adequate evidence to support a rational finding that the . . . reasons proffered by the employer were false, and that more likely than not the employee's [protected characteristic] was the real reason for the discharge." *Clark v. Jewish Childcare Ass'n, Inc.*, 96 F. Supp. 3d 237, 249 (S.D.N.Y. 2015).

Under a mixed motives analysis, "what remains clear is that the NYCHRL has simplified the discrimination inquiry: the plaintiff need only show that her employer treated her less well [than other similarly situated employees], at least in part for discriminatory reasons. The employer may present evidence of its legitimate, non-discriminatory motives to show the conduct was not caused by discrimination, but it is entitled to summary judgment on this basis only if the record established as a matter of law that discrimination played *no* role in its actions." *E.E.O.C. v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 836 (S.D.N.Y. 2013) (quoting *Mihalik*, 715 F.3d at 110 n.8) (alterations and emphasis in original); *accord Trower v. Mount Sinai Hosp.*, No. 16-CV-4322 (KPC), 2018 WL 4283724, at *8 (S.D.N.Y. Sept. 6, 2018).

In sum, Continental is entitled to summary judgment because South has not adduced any evidence tending to show that his termination was motivated, even in part, by discriminatory animus. The portions of the record to which South points, as this Court will explain, are simply insufficient, even when considered cumulatively, for him to establish that a genuine dispute of material fact exists. The Court is mindful that the NYCHRL has "uniquely broad and remedial purposes." *Bennett v. Health Mgmt Sys., Inc.*, 936 N.Y.S.2d 112, 116 (1st Dep't 2011) (citation omitted). But under *McDonnell-Douglas*, a mixed motive analysis, or some combination of the two—or any plausible standard—South's claim fails as a matter of law because no reasonable jury could conclude that age played any role in his termination.

Assuming, *arguendo*, that South can even make out a *prima facie* case of discrimination, Continental has proffered a legitimate reason for his termination that would be sufficient for the corporation to carry its burden at the second step of the *McDonnell-Douglas* framework. As the evidence overwhelmingly shows, after Continental created the MCU the NYC office began struggling with the volume of such cases. The situation became so dire that the office required more MCU attorneys. The MCU refused to accept South, as well as several of his colleagues, requiring Siegel to hire new lawyers who would be so certified. In making these additional hires, Siegel was required to fire the same number of attorneys he hired.

Siegel thereafter undertook two separate evaluations of all of the attorneys in the NYC office, first in February 2014 and again in August. In both sets of evaluations, South was among the three lowest ranked attorneys. Siegel provided the spreadsheets to his superiors, who fired the three attorneys who received the lowest ratings in the final round of evaluations. These two assessments also followed years of consistently mediocre reviews of South's work, his refusal to

accept criticism or make changes, and complaints from other Continental employees and the company's insureds.

Particularly in light of this legitimate explanation, supported by ample evidence, the flaw most fatal to South's claim is the complete absence of evidence, direct or circumstantial, that discriminatory animus played any role in his termination. For instance, he has not pointed to any comments that evince such animus. *See Carter v. Verizon*, No. 13-CV-7579, 2015 WL 247344, at *6 (S.D.N.Y. Jan. 20, 2015) (granting motion to dismiss as to NYCHRL claim, in part because plaintiff failed to allege any remarks that "could fairly be viewed as reflecting discriminatory animus"); *Wright v. Jewish Child Care Ass'n of N.Y.*, 68 F. Supp. 3d 520, 526–27 (S.D.N.Y. 2014), *appeal dismissed* (2d Cir. June 10, 2015); *Hamburg v. N.Y. Univ. Sch. of Med.*, 62 N.Y.S.3d 26, 35 (1st Dep't 2017) (affirming Supreme Court's dismissal of NYCHRL age discrimination claim, in part because plaintiff "d[id] not recall [her supervisor] or any member of the leadership team ever writing or saying anything that could be interpreted as revealing, either intentionally or inadvertently, the existence of such bias"); *cf. Rollins v. Fencers Club, Inc.*, 8 N.Y.S.3d 202, 203–04 (1st Dep't 2015) (denying defendant summary judgment on NYCHRL age discrimination claim where board member of organization repeatedly referenced plaintiff's age). Indeed, South has explicitly acknowledged that there were no such comments, either directed at him or made in his presence. Pl. CS 56.1 ¶¶ 152–53.

Nor has South identified a single co-worker who was similarly situated in all material respects, with the exception of age, and who was treated differently. *See Ruiz v. Cty. of Rockland*, 609 F.3d 486, 493–94 (2d Cir. 2010) ("[D]isparate treatment . . . is a recognized method of raising an inference of discrimination[.]" (citation omitted)); *Toussaint v. N.Y. Dialysis Servs., Inc.*, 230 F. Supp. 3d 198, 213 (S.D.N.Y. 2018); *Villar v. City of New York*, 135 F. Supp. 3d 105, 121–22,

125–26, 130 (S.D.N.Y. 2015) (denying defendant's summary judgment motion as to NYCHRL sex discrimination claim, in part due to similarly situated male employee who was disciplined less severely for similar conduct, but granting motion as to race claim where there was no such evidence). Finally, contrary to South's conclusory allegations, he has not adduced evidence showing that he was replaced by an employee who was younger. *See Vaigasi v. Solow Mgmt Corp.*, No. 11-CV-5088 (RMB) (HBP), 2017 WL 945932, at \*5–6 (S.D.N.Y. Feb. 16, 2017) (granting defendant summary judgment on NYCHRL age discrimination claim where plaintiff was replaced by two younger employees but where age differences were only seven and eight years), *aff'd*, 2018 WL 4378662 (2d Cir. Sept. 14, 2018); *Kim v. Columbia Univ.*, No. 06-CV-5365 (RPP), 2010 WL 2629575, at \*5 (S.D.N.Y. July 1, 2010); *cf. Franchino v. Terence Cardinal Cook Health Care Ctr.*, 692 F. App'x 39, 41–42 (2d Cir. 2017) (summary order) (reversing grant of motion to dismiss with respect to federal age discrimination claims where plaintiff alleged being replaced by "much younger" employees).

Indeed, the composition of the Continental workforce following South's termination is detrimental to his claim. South is of course correct that he was sixty years old when terminated and that his two colleagues who were similarly fired were 60 and 62. He fails to acknowledge, however, that the three of them were not the oldest Service Center attorneys: Richard Dell, age 65, remained. There were also three other attorneys between the ages of 55 and 60. *See Kaiser v. Raoul's Rest. Corp.*, 976 N.Y.S.2d 59, 61 (1st Dep't 2013) (dismissing NYCHRL claim, including under mixed motives analysis, where "Defendants proffered evidence that two of their maître d's and at least one waitress, all of whom were older than plaintiff, had worked at the restaurant for decades, and continued to do so after plaintiff was fired."). And among MCU attorneys, there remained two, Charles Siegel and Loretta Hottinger, who, at 63 years old, were each older than

South, and a third, Jack Cohen, who was only two years younger. *See id.* Cohen, in fact, was promoted the very next year, when he was 59 and thus only a year younger than South when he was terminated. *See Shapiro v. City of New York*, No. 13-CV-8647 (DLC), 2015 WL 4002437, at *11 (S.D.N.Y. July 1, 2015) (granting defendants summary judgment on NYCHRL age claim, in part because there were older employees who were promoted).

South's unfounded contention that he was replaced by younger attorneys turns on the fact that the three MCU attorneys who were hired—and the accommodation of whom was the reason for the reduction in force—were younger than him. This argument is unavailing, however, because these employees did not replace South, as—unlike him—they were certified to handle cases in the MCU, a separate division responsible for the most complex claims. *See Martinez v. N.Y.C. Transit Auth.*, 672 F. App'x 68, 71 (2d Cir. 2016) (summary order) ("no one was hired to replace the Plaintiffs"); *Kaplan v. Beth Israel Med. Ctr.*, No. 07-CV-8842 (RPP), 2010 WL 1253967, at *4 (S.D.N.Y. Mar. 31, 2010) (new hires following plaintiff's termination were not similarly situated and therefore did not replace him because they were "staff pathologists" whereas he had been a "director"); *Hamburg*, 62 N.Y.S.3d at 36 ("Also unavailing is plaintiff's argument that a discriminatory motive may be inferred from the fact that, after she left NYU, her functions at Gouverneur were assigned to a younger physician, Dr. Jodi Cohen, who, according to Dr. Recht's testimony, was in her 40s. To begin, Dr. Cohen was not hired to replace plaintiff; she had been working in the radiology department since 2006, and was a member of [a different section of the radiology department]."). Moreover, to the extent South argues, implicitly or otherwise, that there was an effort to rid the Service Center of older attorneys while replenishing the NYC office with

younger MCU hires, South has adduced no evidence in support of this contention, which is further undercut by the record.[20]

In an effort to adduce some evidence in support of his claims, South presents the Court with a scenario that he says makes no sense in the absence of discrimination: he was a stellar employee who was fired. This argument is flawed for myriad reasons. First, assuming, *arguendo*, that South was indeed an exemplary attorney, the mere fact that he was fired does not give rise to an inference of discrimination. Indeed, there are a host of reasons, other than merely his handling of cases, for which South could legally have been fired. Critically, there is no evidence to support South's theory that it was based on his age. To the contrary, the record supports only the explanation set forth by Continental, namely that South was one of the three lowest performing Service Center attorneys and thus was selected to be fired as part of the reduction in force to allow for the hiring of more MCU attorneys.

Moreover, the factual bases on which South has staked his position are flawed. South relies largely on two sets of evidence: (1) his receipt of various awards and accolades and (2) the allegedly positive view of him held by Siegel, his direct supervisor since 2001. With respect to accolades, he notes, for instance, that he received the coveted "Platinum Focus Award" in 2007; he was nominated as one of the best Senior Litigation Attorneys; he prevailed in the first MCU case to be tried before a jury by the New York office; and he led Continental in trial verdicts in 2011. South's contention is undermined, however, because all of these accolades and positive reviews occurred at least three years prior to his August 2014 termination. The argument that he was fired despite excelling is thus deprived of much of its persuasive force.[21]

---

[20] After the reduction in force, the average age of MCU-approved attorneys (51.6) was nearly identical to that of non-approved attorneys (52.4). *See* Def. 56.1 ¶ 125.

[21] Although not referenced in his Rule 56.1 Counterstatement or relied on in his moving papers, South provided the Court with performance reviews prior to 2010, which contain some positive comments. As an initial

South's reliance on the supposedly positive view that Siegel had of him is also misplaced. South points out, for instance, that Siegel began to funnel him MCU cases after the creation of that unit, repeatedly approached the Claims Department about approving South to handle MCU matters, and pretended to assign certain cases to himself so that South could handle them. But it was none other than Siegel who performed South's year-end performance reviews and the two assessments on which management based its decision in implementing the reduction in force. While South may dispute certain of the assertions contained in those reviews, he concedes that Siegel performed them and that both of the final assessments indicated he was one of the three worst performing Service Center attorneys in the office. In response, South argues that, "[Continental] required MTA Siegel to create bogus reviews of lawyers in his office to justify Mr. South's termination." Pl. Opp. at 17, ECF No. 30. Not only is this conclusory assertion unsupported by even a single piece of evidence, it is belied by the record. *See* Siegel Tr. 95:1–9.

Finally, the Court notes that Siegel's evaluations were far from the only evidence indicating that South was not an exemplary employee. Indeed, there were numerous complaints from people outside the Continental management team, namely the corporation's insureds and South's colleagues, both lawyers and other employees. South's own conclusory allegations to the contrary are wholly insufficient, particularly on a motion for summary judgment. Indeed, in light of the ample evidence adduced by Continental, South's subjective opinion of the quality of his performance fails to raise a material issue of fact. *See Twomey v. QuadGraphics*, No. 13-CV-1109 (RA), 2015 WL 5698002, at *7, 10 (S.D.N.Y. Sept. 28, 2015) (even under the NYCHRL, "Plaintiff must offer some proof beyond his own assertions that age was a factor considered by [the

---

matter Continental does not—and never has—contended that South was subpar at every aspect of his job. In any event, for the aforementioned reasons this evidence similarly fails to show that discriminatory intent played any role in South's termination.

defendant]." (citations omitted)); *Hu v. UGL Servs. Unicco Operations Co.*, No. 13-CV-4251 (LGS), 2014 WL 5042150, at *6, 8 (S.D.N.Y. Oct. 9, 2014) (concerning NYCHRL claim, "[a] plaintiff's subjective disagreement with his reviews is not a viable basis for a discrimination claim" (citation omitted)), *appeal filed* (Dec. 8, 2014).

In another attempt to circumvent the obstacle posed by his lack of evidence, South argues, yet again in conclusory fashion, that his exclusion from the MCU beginning in 2005 was itself motivated by discriminatory animus and was one part of a conspiracy to eventually terminate him. This contention flies in the face of reason, as well as the evidence. As an initial matter, it betrays common sense to suggest that when Continental created the MCU in 2005, it was already planning to terminate South *nine years* later. Indeed, even when acts evince some semblance of discriminatory animus, a much closer temporal relationship is typically required to establish that an adverse employment action was motivated, at least in party, by said animus. *See Osborne v. Moody's Investors Serv., Inc.*, No. 17-CV-1859 (ALC), 2018 WL 1441392, at *4 (S.D.N.Y. Mar. 22, 2018) (in assessing NYCHRL claim at motion to dismiss stage, acknowledging that there is no "bright-line rule for when remarks become too attenuated," but nonetheless concluding that eight months between remarks and plaintiff's termination was insufficient to give rise to inference of discriminatory animus, particularly absent an explanation of how they related to her termination (citation omitted)); *Inguanzo v. Housing & Servs., Inc.*, No. 12-CV-8212 (ER), 2014 WL 4678254, at *16 (S.D.N.Y. Sept. 19, 2014) (regarding Title VII discrimination claim, insufficient nexus between derogatory comments and adverse employment action when separated by a year or more), *aff'd*, 621 F. App'x 91 (2d Cir. 2015); *Nidzon v. Konica Minolta Bus. Corp.*, 752 F. Supp. 2d 336, 351-52 (S.D.N.Y. 2010) (period of thirteen and nineteen months too long to infer discriminatory

intent underlying adverse employment action from remarks with respect to Title VII, NYSHRL, and NYCHRL claims).

With respect to the notion that he was ever excluded from the MCU for discriminatory reasons, there is simply no evidence to support that contention. South attempts to read discriminatory intent into two comments made by Perry: (1) his acknowledgement at his deposition that the company preferred "aggressive" attorneys for the MCU and (2) his January 2013 email to Orr about how Siegel "always brings up a few long term lawyers we simply do not want handling [MCU] cases," specifically referencing South. Neither of these facially neutral comments gives rise to an inference of discrimination. *See Wright*, 68 F. Supp. 3d at 526-27 (in Title VII and ADEA context, comments insufficient to establish *prima facie* case of discrimination where plaintiff was told that she was not "suitable" and did not "fit" the program); *Godbolt v. Verizon N.Y. Inc.*, 981 N.Y.S.2d 694, 695–96 (1st Dep't 2014) (stray remarks doctrine applies to NYCHRL claims).

South's reliance on the second comment is especially unavailing in light of the ages of Perry, 66, and Orr, 63, who were the parties to the email and who also occupied prominent roles in managing the MCU. *See Drummond v. IPC Int'l, Inc.*, 400 F. Supp. 2d 521, 532 (E.D.N.Y. 2005) ("a well recognized inference *against* discrimination exists where the person who participated in the allegedly adverse decision is also a member of the same protected class."). Furthermore, this communication occurred in January of 2013, approximately *twenty months* prior to South's August 2014 termination. *See Moore v. Verizon*, No. 13-CV-6467 (RJS), 2016 WL 825001, at *9 (granting motion to dismiss NYCHRL age discrimination claim, in part because remarks "occurred at least months before Plaintiff's first suspension and nearly a year prior to her termination"). Finally, both comments are wholly consistent with Continental's legitimate

explanations for not approving South to work on MCU matters.  South argues that the email from Perry conveyed that the management team did not want these lawyers approved to handle MCU matters *because* they were "long term" attorneys.  Not so.  Rather, it only communicates that there were lawyers who had been at the company for some time and who were not fit, in the eyes of management, to work on such cases.  Especially because, as previously noted, there were in fact attorneys roughly the same age as and older than South who belonged to the MCU, there is simply no basis to infer discriminatory intent from these otherwise innocuous comments.

South's argument that his exclusion from the MCU and his termination were part and parcel of the same conspiracy is further undercut because the groups of people responsible for approving attorneys to handle such matters and for the reduction in force were entirely separate.  Neither Siegel nor Granstrand had any authority to approve attorneys to work on MCU matters, and Perry and the remainder of the MCU played no role in the reduction in force.  Indeed, Granstrand, who suggested the reduction in force, and Siegel, who ranked the attorneys for termination, were not involved either in establishing the MCU or in selecting attorneys to be a part of the unit.  Particularly in the absence of any evidence, there is no basis to infer that Continental engaged in a nine year plan to terminate South that began with his exclusion from the MCU.

South also seems to argue that the increased influence of the Claims Department in the management of the MCU further contributed to his exclusion from the unit and/or his eventual termination.  In addition to having no evidence in support of this contention that Claims began to exert greater control over the MCU—or that this alleged change in control somehow had a detrimental effect on South's standing—his argument is undercut by the fact that he was not approved to work on MCU cases from its inception in 2005.  It is thus unclear what further damage he suffered from the purported assertion of control by the Claims Department or how that entity

could have caused his termination.  To the extent South is attempting to argue, implicit or otherwise, that the alleged increasing influence of the Claims Department contributed to his mediocre performance reviews, which began at least by 2010, there again is no evidence to support this assertion.  Moreover, no one in the MCU or the Claims Department played a role in South's evaluations, either the regular year-end reviews or the two assessments on which the reduction in force was based.  As previously noted, every one of those evaluations was performed by Siegel.

South further complains that there was no reference to his performance in the meeting where he was terminated.  But the company has never contended that South's performance was too substandard for him to remain employed.  Rather, its position is that his work product was not of the caliber to place him in the MCU, more MCU attorneys were needed due to case volume, and a Service Center attorney had to be let go for each MCU attorney hired.  The point is thus that South was one of the three least competent Service Center attorneys—not that he was unfit to be employed or that the company would have terminated him in the absence of the evolving nature of its caseload.

South searches in vain for evidence of discriminatory animus by relying on several innocuous incidents.  First, there were several occasions on which various Continental employees were, in essence, rude to him.  Specifically, he alleges the following: (1) Siegel "threw him under the bus" in a conference call during 2005 and failed to defend South against criticism from another member of the management team;[22] (2) in 2007, Siegel was critical of a presentation made by South; (3) at the same meeting Anway allegedly walked away after asking a question, while South was still responding and (4) South won a major jury verdict that allegedly went unrecognized by

---

[22] As an aside, South claims Siegel's motivation for taking these actions was that he did not want him handling MCU cases, which directly contradicts much of South's arguments related to Siegel's purportedly positive view of his work.

Continental management. If true, this behavior towards South may have been impolite or unsupportive. But these events do not bolster his claim of discrimination, principally for three reasons. First, as South acknowledges, none of these events involved comments about his age or involve any other action that indicates the behavior was motivated by discriminatory animus. *See Wright*, 68 F. Supp. 3d at 526-27 (in Title VII and ADEA context, comments insufficient to establish *prima facie* case of discrimination plaintiff was told that she was not "suitable" and did not "fit" the program); *Godbolt*, 981 N.Y.S.2d at 695–96 (stray remarks doctrine applies to NYCHRL claims). Second, most of the events occurred more than seven years prior to his termination and thus have insufficient temporal proximity to his termination. *See Osborne*, 2018 WL 1441392, at *4; *Inguanzo*, 2014 WL 4678254, at *16; *Nidzon*, 752 F. Supp. 2d at 351–52. Finally, with respect to the failure by management to recognize South's jury verdict approximately four months before his firing, he asserts, in conclusory fashion, that "no such omission was made in respect of any younger lawyers' verdicts" without adducing a single piece of evidence. Pl. Opp. at 17. In any event, by this point South had already been severely reprimanded, including being issued the December 6, 2013 letter, which provides a reasonable explanation as to why the corporation might not have announced his success sufficiently to his liking.

Lastly, the Court's conclusion is buttressed by two additional considerations. First, the individuals who orchestrated the reduction in force were roughly the same age as South or older. *See Drummond*, 400 F. Supp. 2d at 532 (there is "a well recognized inference *against* discrimination exists where the person who participated in the allegedly adverse decision is also a member of the same protected class."). Second, throughout his entire employment, despite the available reporting channels and the constant communication South had with management following the December 2013 reprimand letter, he never once complained that he was being treated

unfairly as a result of discrimination. *See Osborne v. Literacy Partners, Inc.*, No. 04-CV-6652 (DAB), 2007 WL 2298354, at *6 (S.D.N.Y. Aug. 9, 2007) (plaintiff's failure to utilize internal complaint procedures to complain about alleged discrimination undermined her discrimination claims).

## II.   Hostile Work Environment

South also asserts a claim for hostile work environment, on which Continental is also entitled to summary judgment. A hostile work environment is actionable under the NYCHRL even if a plaintiff has not alleged that harassment was severe and pervasive. *See Williams v. N.Y.C. Housing Auth.*, 872 N.Y.S.2d 27, 41 (1st Dep't 2009). The entire range of conduct above the "petty slight or trivial inconvenience" is actionable. *Id.* "[T]he relevant consideration is whether there is a triable issue of fact as to whether the plaintiff has been treated less well than other employees because of' his or her protected status." *Armstrong v. Metro. Transp. Auth.*, No. 07-CV-3561 (DAB), 2015 WL 992737, at *6 (S.D.N.Y. Mar. 3, 2015).

Here, South has similarly failed to raise a genuine dispute of material fact. Indeed, there is no evidence that conduct by any employee of Continental rose above the level of a petty slight or trivial inconvenience. *See Kim*, 987 N.Y.S.2d at 344. While South has pointed to a few facially innocuous comments and events, as the Court has described in great detail, there is no indication that discriminatory intent underpinned any of them. Moreover, a few stray comments or events are insufficient, even under the more liberal NYCHRL, for South's claim to survive the summary judgment stage. *See Tse v. N.Y. Univ.*, No. 10-CV-7207 (DAB), 2013 WL 5288848, at *15 (S.D.N.Y. Sept. 19, 2013) (a few stray comments insufficient to withstand defendant's summary judgment motion on plaintiff's NYCHRL hostile work environment claim); *cf. Gonzalez v. EVG, Inc.*, 999 N.Y.S.2d 16, 17–18 (1st Dep't 2014) (granting defendant summary judgment on state

law hostile work environment claim but denying as to more liberal city law where conduct included "constant use of language degrading women, telling of sexually explicit jokes, and overt viewing of pornography in the workplace").

## CONCLUSION

The Court has been mindful of the liberal interpretation afforded the NYCHRL. But South has nonetheless failed to raise a genuine dispute of material fact necessitating a trial. For the foregoing reasons, Continental's motion is granted. The Clerk of Court is respectfully directed to enter judgment in favor of Continental, terminate the motions pending at docket entries twenty and thirty-six, and to close the case.

SO ORDERED.

Dated:      September 27, 2018
            New York, New York

                                   _____
                                   Ronnie Abrams
                                   United States District Judge